DEMING & CO. *v.* MERCHANTS' COTTON-PRESS, ETC., CO.

(*Jackson.*   June 6, 1891.)

1. COMMON CARRIER.   *Delivery to, sufficient, when.*

Common carrier's liability for cotton begins upon its delivery to a warehouseman for compression for shipment, where by contract, express or implied, the carrier has authorized the warehouseman to receive cotton for him, at the warehouse, and give receipts therefor to owners, and to insure it for carrier's benefit, and to hold and compress it for shipment by the carrier—the latter giving out bills of lading to owners before taking actual custody of the cotton upon presentation of the warehouseman's receipts.   (*Post, pp. 313–320.*)

2. SAME.   *Exemptions of, strictly construed.*

Bill of lading exemptions of carrier from his common law liability, even when valid, are not favored, and should be strictly construed.   Cases not in terms included by the exemption, should be excluded from its operation.   (*Post, p. 320.*)

3. SAME.   *Same.   Examples.*

And therefore common carriers are not excused from liability for loss of cotton by fire, caused without their negligence, after its delivery to carrier and while it remained in warehouse of compress company for compression for shipment, although their respective bills of lading contained valid fire-clauses, providing for exemption from liability for loss by fire, in general terms, or "while in depots or places of transshipment," or "while at depots or stations," or "while in transit or at stations."   Warehouse of compress company is not included in any of said clauses.   (*Post, pp. 321–324.*)

4. SAME.   *Same.   Same.*

But the carrier is excused from liability for a non-negligent loss of cotton by fire, after delivery to him and while it remained in warehouse of compress company for compression for shipment, where his

bill of lading contained a valid fire-clause exempting him from liability for loss "by fire or other casualty in or at any cotton-press or during transportation to or from press." (*Post, pp. 320, 321.*)

5. SAME. *Fire-clause exemption. Consideration.*

If otherwise free from objection, a fire-clause exemption contained in a through bill of lading, stipulating for shipment at special rates over several distinct, independent connecting lines, is not void for want of consideration because the contracting carrier charged and received, in addition to usual rates for transportation with restricted liability, compensation reasonable in amount for effecting insurance upon the goods and for procuring carriage beyond his own line. (*Post, pp. 324, 325.*)

6. SAME. *Same. When reasonable.*

If otherwise free from objection, a fire-clause exemption contained in a through bill of lading, stipulating for shipment at special rates over several distinct, independent connecting lines, is not void because the several carriers had no arrangement *inter sese* whereby the shipper could, upon demand, have obtained continuous through transportation over all their lines upon terms of unrestricted liability of the carriers. (*Post, pp. 325–329.*)

Cases cited: Dillard *v.* Railroad, 2 Lea, 288; Railway Company *v.* Sowell, *ante, p.* 17; 2 Wall., 107; 17 Wall., 360.

7. SAME. *Same. Same.*

The several distinct, independent connecting lines are not, for this purpose, treated as constituting a single carrier. (*Post, pp. 325–329.*)

8. SAME. *Same. Same.*

And it is wholly immaterial, in this regard, whether the contracting carrier be an initial or other carrier in the line, or a mere transportation company owning no part of the line. (*Post, pp. 328, 329.*)

Case cited: Transportation Company *v.* Bloch Brothers, 86 Tenn., 392.

9. SAME. *Same. Loss not within exemption. Proximate cause.*

Common carrier, though protected by a valid fire-clause exemption, is not excused from liability for loss of goods by fire while in his custody, even when the fire occurred without his negligence, if by his fault or negligence the goods were placed in reach of or contact with the fire. The carrier's negligence, not the fire, is, in such case, the proximate cause of the loss. (*Post, pp. 351–353.*)

Deming & Co. *v.* Merchants' Cotton-press, etc., Co.

10. SAME.   *Case in judgment.*

Cotton was burned on board car for shipment.   The fire occurred without fault of the carrier.   He was protected by valid fire-clause exemption.   But for unusual delay in removing car and breaking of machinery in the effort to remove it, the cotton would not have been within reach of the fire   The delay and breaking of machinery was not explained.

*Held:* The carrier was negligent, and that negligence, not the fire, was the proximate cause of the loss.   (*Post, pp. 351–353.*)

11. SAME.   *Burden of proof.*

And the burden of proof was upon carrier to explain the delay and breaking of machinery, so as to excuse himself from the imputation of negligence.   (*Post, p. 353.*)

12. SAME.   *Pleadings.*

And general allegations of carrier's liability in the pleadings was sufficient to entitle plaintiff to relief upon said facts.   (*Post, p. 351.*)

13. FIRE INSURANCE.   *Contract to carry.   Liability for its breach.*

Compress company agreed to insure against loss by fire for benefit of carriers and owners all cotton delivered at its warehouse for compression and shipment.   Cotton worth $700,000 was thus delivered. Insurance was procured for only $301,750 by the compress company under its contract.   Total loss of the cotton by fire occurred without negligence of the compress company.

*Held:* The compress company is not liable absolutely as insurer, but only for such damages as resulted from breach of its contract to carry insurance.   (*Post, pp. 313–317.*)

Case cited and approved: Lancaster Mills *v.* Merchants' Cotton-press Company, 89 Tenn., 1.

14. SAME.   *Same.   Defense against liability.*

The compress company, though in default, is not liable in such case for any damages if the owner, declining to rely upon the company's contract, has obtained adequate insurance for himself upon his cotton. *A fortiori*, there can be no liability if the owner has been paid his loss in full by his own insurer.   (*Post, pp. 331–333.*)

15. SAME.   *What constitutes payment of loss.*

The transaction constitutes payment of loss when the insurer or his agent advances to the insured or his agent, either directly or indi-

Deming & Co. *v.* Merchants' Cotton-press, etc., Co.

rectly, under guise of a loan or otherwise, a sum equal to the loss claimed—the insured agreeing to repay the amount to the insurer when it should be recovered of the carrier or other bailee having custody of the goods when burned. And it is not material that this advancement was made pursuant to stipulation in policy. (*Post, pp. 331–339.*)

16. SAME. *Estoppel by payment of loss.*

The insurer, by paying loss with full knowledge of all the facts, estops himself to deny that it falls within the policy. *A fortiori*, the insured is estopped to make such denial after receiving payment in any contest with third persons. (*Post, pp. 338, 339.*)

17. SAME. *Subrogation of insurer to insured's rights.*

The insurer, having paid loss, is subrogated for his indemnity to any right the insured may have had to recover the value of the insured property from any third person whose negligence caused the loss, or from a common carrier who, if not negligent, was unprotected by any valid exemption from liability. (*Post, pp. 333–339.*)

18. SAME. *Same.*

But the owner's insurer, having paid loss, should not be subrogated to the owner's right of action against compress company for failure to carry the stipulated insurance. (*Post, pp. 348, 349.*)

19. SAME. *Contribution among co-insurers.*

Two sets of insurers placed fire policies upon the same cotton—one set insuring the owner's risk alone by policies issued to them directly, and the other set insuring not only the owner's risk, but those of compress company and carrier having the cotton in possession for compression and shipment. The latter set of policies was issued to compress company for its own and the carrier's and owner's benefit.

*Held:* That, assuming the existence of contemporaneous double insurance of the cotton as regards the owner's risk, yet there can be no contribution between the two sets of insurers in the event of loss until the risks of compress company and carriers have been first fully provided for out of the insurance effected by compress company. (*Post, pp. 346–350.*)

20. SAME. *Same. The American clause construed.*

The insurance, even if double, is not contemporaneous, and, for that reason, there can be no contribution among the co-insurers where two

Deming & Co. *v.* Merchants' Cotton-press, etc., Co.

or more open policies of different dates have been issued by different insurers for the same risk, subsequently attaching at same instant under all the policies, there being a provision on the face of each policy against contribution with insurers of prior or subsequent date. Each insurer's liability attaches in such case as of date of his policy, not as of date of risk incurred. (*Post, pp. 339–347.*)

Cases cited: 14 Wendell, 399; 15 Maryland, 197; 6 Mass., 208; 2 Wash. C. C. Rep., 95; 12 Wheaton, 383; 1 Mason, 146; 2 Mason, 476; 1 W. Black R., 416.

21. SAME. *Interest of carrier not before Court.*

It appearing that a carrier interested in the insurance money under the policies procured by compress company was not before the Court, no appropriation of that part of the fund is made. (*Post, pp. 355, 356.*)

### FROM SHELBY.

Appeal from Chancery Court of Shelby County. B. M. ESTES, Ch.

TAYLOR & CARROLL, H. C. WARRINER, and C. W. FRAZER for Complainants.

TURLEY & WRIGHT and METCALF & WALKER for Compress Companies and their insurers.

HOLMES CUMMINGS and —— POPPLETON for C., C., C. & I. R. R. Co.

HOLMES CUMMINGS for N. N. & M. V. R. R. Co., Kanawah Dispatch Co., and O. & T. R. R. Co.

GANTT & PATTERSON and W. M. RANDOLPH for Blue Line.

THOMAS H. JACKSON for ·Phœnix Insurance Company.

W. D. BEARD and TAYLOR & CARROLL for Insurance Company of North America.

SNODGRASS, J.   At the last term of this Court two cases—*Lancaster Mills* v. *The Merchants' Cotton-press and Storage Company et al.* and *Coates & Co.* v. *The Merchants' Cotton-press and Storage Company et al.*—were decided. The first of these is reported in full in opinion by Judge Lurton.  5 Pickle, pages 1–62.  In that opinion, which fully states many of the facts now being considered, and not necessary to be restated here, it was mentioned that the case was "one of a series of suits [and the Coates case was another], involving the liabilities of the compress company and various railroad companies for the loss of [about] 14,000 bales of cotton, valued at $700,000, burned on the night of November 17, 1887, while in press No. 4 of the defendant compress company, at Memphis, Tenn."

In the case now being considered are presented the questions undisposed of in those two cases, and nineteen others herewith consolidated, together with all other questions arising on bills then pending in the Chancery Court, and amended and cross-bills subsequently filed against the compress com-

pany and various railroad and transportation companies and insurance companies, to determine the several rights and liabilities of all such parties to complainants sustaining the loss and *inter sese.*

Obviously it is impossible, within the limits to which an opinion must, of necessity, be confined, to take up *seriatim* and state the pleadings and facts of each particular case embraced in a record of 4,500 pages; nor is it necessary, for the determination of certain questions disposes of the suits in classes, many of them depending upon the same questions and to be determined upon adjudication of certain general principles applicable alike to these and, in certain instances, to all the classes. Nor is it necessary to state in full the decree of the Chancellor. The modifications of that decree (which was an entirety in all the cases now consolidated), indicated as a result of the principles now settled by this opinion, determine the proper decree to be drawn as a settlement of the questions raised in each particular case. It is sufficient to say that the skill and ability of the eminent counsel representing the different parties in the pleadings there and assignments of error here, have so presented, and the forceful and far-reaching comprehension of the Chancellor has so determined, the various questions involved as to enable us to review them all as a series of general questions; and we proceed to present and discuss them in the most natural order in which they arise, inci-

dentally noticing, of course, and applying those already settled in the Lancaster Mills case.

The principal question of primary liability of the compress company for loss on account of *negligence*, was settled in the Lancaster Mills case, on evidence not materially supplemented in this record, on the verdict of a jury finding that the company was not liable. The same result was reached in the several other cases now before us by decree not upon verdicts, and with this result we are entirely satisfied, and to this extent the decree is affirmed.

Another question practically determined in that case was that the effect of the contracts of the compress company with the several railroads and transportation companies, and impliedly with all persons dealing with the compress company as depositors of cotton, was to make that company liable to railroads and transportation lines who had such contracts, and to owners of cotton deposited with it for compression, not as an insurer, but upon its agreements express and implied to procure insurance in good and solvent companies sufficient to cover any loss while such cotton was under the control of the compress company, and until loaded on cars for transportation.

The inception of the liability thus assumed was in the contracts it made with carriers. One of these contracts is set forth in full in the Lancaster Mills case, and the others stated to be, as in fact they are, in substance identical.

Another, involved in this case, we quote in full for the purpose of more specific statement on points to be here considered:

"This agreement, made and entered into on this May 24, 1889, between the Cairo and Vincennes Railroad Company, * * * termed the party of the first part, and the Merchants' Cotton-press and Storage Company, termed the party of the second part, *witnesseth:*

"*First.*—The party of the first part hereby agrees to give to the party of the second part all cotton to compress that they carry out of Memphis compressed. The party of the second part bind themselves to properly and promptly compress all of said cotton, and shall insure the same for the benefit of the first party, and the price to be paid therefor by said first party shall be at the rate of twelve and one-half cents per one hundred pounds, bill of lading *weights*, for all cotton compressed, etc., on and prior to August 31, 1882, and ten cents per one hundred pounds, bill of lading weights, for all cotton so compressed, etc., thereafter, during the term of this agreement.

"This compensation covers compressing and insurance, as well as the use of the second party's grounds, sheds, platforms, steam-boat landing, and all services rendered by said second party in and about such cotton delivered it hereunder, until the same is delivered, either in cars or to steam-boats, to the first party by the second party.

" *Second.*—Such insurance shall be taken for the

benefit of the first party in good and solvent companies, so as to cover any loss while such cotton is under the second party's control, and until delivered to the first party.

"*Third.*—The second party shall be liable for any loss arising from negligence or lack of care in anywise to such cotton while under its control, agreeing to be bound therefor as a *bailee* for hire, and for any such loss shall pay the first party all damages and cost, or the first party may retain any dues to the second party to cover such loss. This, however, not to be limited to the amount of such dues.

"*Fourth.*—The first party hereby constitutes the second party its agent to receive such cotton for it, and sign receipts, on which bills of lading may be issued when cotton is delivered in their compresses on the ground located at its river landing.

"*Fifth.*—So far as it can legally do so, the first party agrees to establish no other compress agency, nor employ any other compress to do its compressing of cotton at Memphis, Tennessee, during the term of this contract.

"*Sixth.*—All bills for compressing cotton shall be paid weekly.

"*Seventh.*—This contract is to continue in force until August 31, 1896, said rate of twelve and one-half cents per one hundred pounds being for one year from September 1, 1886, and said rate of ten cents per one hundred pounds for the remaining nine years; and this contract is to relate back

to said first day of September, 1886, and is to cover, as to its terms, all compressing of cotton by the second party for the first party since that date."

The first of these contracts was made with the Louisville and Nashville Railroad, and when the facilities for warehousing and compression of the Merchants' Cotton-press and Storage Company were very limited. But this company built other presses, enlarged its facilities, and extended its contracts until all the railroad and transportation companies doing business in Memphis, and having an initial carrier there, were included in the contractual arrangement under which it did business. It was originally contemplated that all cotton received into its various compresses should be "permitted" by the various carriers in the manner described in detail in the Lancaster Mills case; but this contemplated method was not adhered to, and cotton was received from owners without permits. When so delivered, the compress company receipting therefor and agreeing, either in face of receipts or understood to do so as fully when such receipts were not executed, to cover all cotton delivered with insurance.

Such we hold to have been the actual fact of their several special contracts and the effect of their reception of cotton for compression according to the understanding between themselves and owners. The usage as to all was in substantial accord with special agreements as to some of the

patrons of the company, as before explained—that is, to insure for carriers, by contracts expressly made, and owners expressly made in the carrier contracts, and dray receipt contracts or usage.

It therefore follows that the compress company, not being liable to any for negligence in suffering the cotton to be burned, is liable to all interested as carriers, by express contracts made with them, or owners, under such express contracts, and those evidenced as made with owners by dray receipts and usage, for the failure to procure insurance sufficient to cover any loss that occurred.

The compress company had in fact procured insurance only to the amount of $301,750, while the entire loss was about $700,000.

Before going to other questions involved, it is proper to consider here the relation which this company occupied to the railroad and transportation companies with which it had contracts, and in what sense delivery of cotton to its compresses is to be taken as delivery to these carriers. For them it is argued, on the one hand, that where cotton was delivered to the compress company, and its receipts executed therefor, and these given up to the railroad or transportation companies, and bills of lading by them issued for such cotton, there was no actual delivery to the carriers; and, on the other hand, that if there was, in such event, a delivery to them, then the cotton was in their depots or stations within the meaning of certain exemption clauses in their bills of lading,

wherein, in various forms, they have stipulated against liability in cases of fire in their depots, stations, or places of transshipment.

Both of these contentions are unsound. The carriers selected by contract — and by usage as to those who had no contracts — the compress company as their agent, and agreed to be bound on delivery to it when they executed bills of lading. It was competent for them to do this, and they did it; and, while doing so, those who had contracts with the compress company, recognizing it as a *special risk* before the cotton came actually into their own depots or cars, stipulated with their agent (the said compress company) to carry insurance for their indemnity, as they also had the right to do; while those who had no such contract took this special carrier risk without it, as they also had the right to do.

But the compresses of the company did not thereby become depots, stations, or places of transshipment of the carriers, even of those who had none of their own in Memphis, because they contracted, where such carriers issued bills of lading, with reference to intended shipment over lines which did have; and the same rule applies to them as to initial lines, either alone or in association with others. The compresses were not in fact depots or stations of the railroad or transportation companies, and in no contract entered into do they purport to be. Each road leading from Memphis had its own depot, and each transportation

company not having, contracted to use these lines which did as agents; and hence, their "depots" and "stations" are those meant in contemplation of the carrier contracts into which they entered.

The presses were alone those—constructively as in fact—of the Merchants' Cotton-press and Storage Company, and this company reserved the right to charge storage on cotton after a stated time; and, in receipts given for cotton to be surrendered to the carriers, in lieu of which bills of lading were issued by them, it was stipulated that "if held in press over fifteen days before bill of lading issues, or if sold while in press, fifty cents per bale per month charges will be collected before delivery or shipment."

The form is not given as of all receipts, though it would seem it was so, nor is it deemed very material. It is only one of the evidences (about which, perhaps, the well-understood fact on this point called for none) that nobody contracted for or understood the compress to be a depot or station or place of deposit of any company other than the corporation which owned it. The carriers which had contracts with the compress company, contracted only that the compress company should represent them as agent, and receive in *its* warehouse or press and hold until actual delivery to them, while those who had no contracts with the compress company, had of course no agreement to use compress company's warehouse or press as a depot. Therefore no exemptions not in terms em-

bracing a loss by fire in warehouse for compression, or other cotton-press, include this loss.

General clauses of exemption from loss by fire will be construed to relate alone to loss in depots, stations, on the cars, or in places of transshipment of the carrier after actual custody of the cotton, and held inoperative to excuse from liability for this loss.

These limitations upon the common law liability of a common carrier are not favored. They are to be strictly construed, and limited to the general risk of the carrier after actual custody of the cotton, unless the terms thereof expressly extend to a special risk.

Where, therefore, a carrier has effected an arrangement with a compress company to act as the carrier's agent and receive cotton in the agent's press, and accepts delivery there by the shipper instead of at the carrier's own depot, and upon such delivery issues the ordinary carrier bill of lading stipulating for exemption from loss by fire, it will not be construed to relate to fire in the cotton-press. Such a clause will not cover a special risk like this.

The Kanawha Dispatch is therefore the only carrier entitled to exemption on account of its carrier contracts.

The bills of lading of the Kanawha Dispatch, so far as material to this question, read as follows:

"It is further mutually agreed that no carrier shall be liable for loss or damage of any article

or property whatever by fire or other casualty, in or at any cotton-press, or during transportation to or from press, or while in transit, while in depots or on wharves awaiting shipment, transshipment or delivery, or fire from any cause on land or water."

The Louisville, New Orleans and Texas Railway Company, which the Chancellor held not liable; and the Newport News and Mississippi Valley Company; the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company; the Cairo, Vincennes and Chicago Line; and the Blue Line, which he held liable, are all liable under the principle settled.

The bill of lading of the Louisville, New Orleans and Texas Railway Company, so far as material to this question, is as follows:

"Neither of said carriers shall be liable for leakage of any kinds of liquids, nor for losses by the bursting of casks or barrels of liquid, arising from expansion or other unavoidable causes; breakage of any kind of glass, carboys of acid, or articles packed in glass, stoves and stove furniture, casting machinery, carriages, furniture, musical instruments of any kind, packages of eggs, or loss or damage of hay, hemp, *cotton*, or the evaporation or leakage of liquids of any description, leakage of grain in bulk, or for damages to personal property of any kind, occasioned from delays from any cause or change of weather, or damage by fire, or loss or damage on sea or rivers."

On this point the bill of lading of the New-

21—6 P

port News and Mississippi Valley Company is as follows:

"That this company shall not be liable * * * for loss' or damage by wet, dirt, fire, or loss of weight, or for condition of baling on hay, hemp, or cotton; nor for loss or damage of any kind on any article whose bulk requires it to be carried in open cars; nor damage of perishable property of any kind, occasioned by delays from any cause or change of weather; nor for loss or damage on any article of property whatever by fire or casualty while in transit, or while in depots or places of transshipment, or at depots or landings at point of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on seas, rivers, lakes, or canals."

The bill of lading of the Cleveland, Columbus, Cincinnati and Indianapolis Railway Company, after acknowledging, in the usual form, the receipt of the goods, proceeds:

"Which they agree to deliver at Cleveland, Ohio, station with as reasonable dispatch as the general business will permit, subject to the conditions mentioned below, in like good order (the dangers incident to railroad transportation, loss or damage by fire while at depots or stations, loss or damage of combustible articles by fire while in transit, and unavoidable accidents excepted), upon the payment of charges. * * * It is agreed, and is a part of the consideration of this contract, that neither this nor any company or carrier to whom the

same shall be delivered in the course of transportation to the place of final destination is to be responsible for loss or damage to goods occasioned by providential causes, or by fire from any cause whatever while in transit or at stations."

The bill of lading of the Cairo, Vincennes and Chicago Line, as to this question, is as follows:

"That the Cairo, Vincennes and Chicago line, and the forwarding lines with which it connects and which receive said property, shall not be liable for leakage of oils or any other kinds of liquids; breakage of any kind of glass, earthen or queensware, carboys of acids or articles packed in glass, stoves, stove furniture, castings, machinery, carriages, furniture, musical instruments of any kind, packages of eggs; or for rust of iron and iron articles; or for loss or damage by wet, dirt, fire; or for loss of weight; or for condition of baling on hay, hemp, or cotton; or for loss or damage of any kind on any article whose bulk requires it to be carried in open cars; nor for loss or damage on any article of property whatever by fire or other casualty while in transit, or while in depots or other places of transshipment, or at depots or landings at points of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on seas, rivers, lakes, or canals."

Like clause in the bill of lading of the Blue Line reads:

"It is agreed, and is a part of the considera-

tion of this contract, that the company will not be responsible for leakage of liquids; breakage of glass or queensware; the injury or breakage of looking - glasses, glass show - cases, picture - frames, stove - castings, or hollowware; nor for the injury to the hidden contents of packages; nor for the loss of weight or otherwise of grain and coffee in bags or rice in tierces; nor for the decay of perishable articles; nor for damage arising to any article carried from the effects of heat or cold; nor for the loss of nuts in bags or lemons or oranges in boxes, unless covered with canvas; or loss or damage to goods occasioned by providential causes; or by fire from any cause whatever while in transit or stations; nor will the companies be responsible for damages on tobacco unless it is proved to have occurred during the time of its transit over this line, and notice must be given within thirty hours after the arrival of same."

Settling thus the effect of the exemption clauses in the several bills of lading, we reach the main question made against them all; and that is, that they are void because (1) without consideration and (2) unreasonable.

Taking up these divisions of the question in order, we consider that of consideration first. And here we observe that again the pleadings have been so amended as to meet the difficulty suggested in the Lancaster Mills case that there was an omission of allegation in the pleadings there that the

clause was without consideration, imposed by duress, or unreasonable. In that case it was held that such a stipulation in a bill of lading, wherein a through rate was granted for carriage over lines of more than one carrier, will be presumed to be upon a sufficient consideration and reasonable.

It is now alleged and insisted that the carrier has charged and received compensation additional to that usually taken for transportation with restricted risk, and that in effect the shipper has been made to pay the insurance premium.

It is true that for effecting insurance of the special risk of the compress holding and agreement to procure carriage beyond the line of particular carriers, the charge was slightly greater, but these were additional benefits conferred which justified it, and this was no more than just consideration therefor.

The argument that the stipulation for exemption is unreasonable is based not alone upon the idea that one line of road may not stipulate for such exemption in consideration of its procuring carriage beyond its own line, but it is said that here the various carriers were in combination, forming a continuous line from Memphis to points of destination; or transportation companies, sued as carriers having no line leading from Memphis, were in association with initial lines there and contracting as a continuous line to carry from Memphis to such destination—as, the Kanawha Dispatch; or transportation companies having no lines and no

initial carriers in Memphis were contracting as through lines to carry from Memphis to points of destination—as, the Blue Line, which, without a road, contracted to carry from ocean to ocean.

It is argued that the effect of such agreement as was made by the several lines and transportation companies is the same as though made by a carrier owning the line from Memphis to destination point; that such a carrier could not have stipulated for exemption from fire loss unless it had been ready and willing to have made the shipment under its common law liability, which included such loss; and that the evidence shows that none of the companies or associations sued were prepared or willing to so ship.

The evidence does show that none of them would have issued bills of lading such as these omitting the fire clause, but that all the initial carriers and lines leading from Memphis would have done so over their own lines, but had no arrangement authorizing them to do more.

The question thus presented is the most serious one in the case.

If complainant be right in assuming that these lines or companies shipping by special contract over and beyond any one initial carrier's line, stand upon the same footing as would a carrier owning the entire line over which the shipment was made, then it follows from the fact that they were not ready and willing to execute a contract for shipment under common law liability, the stipulation for ex-

emption against fire loss would be void, for it is well settled in this State that such a clause is only valid where it was optional with the shipper to ship upon or without such agreement. The option need not be in fact offered to the shipper. It is sufficient if it would have been given had he demanded it. *Railroad Company* v. *Manchester Mills*, 88 Tenn., 653; *Louisville and Nashville Railroad Company* v. *Sowell*, *ante*, p. 17.

Before determining this question, it is necessary to notice here a division of it arising upon difference in the character of carrier-lines assuming the obligations. These, though they are susceptible of more, may be, for the purpose of this statement, divided into two classes—one being that of an initial carrier, having a line leading from Memphis to a given point, and a traffic arrangement or combination with connecting lines whereby it is authorized to make (and make only) the contract in question as to shipment beyond its own line; the other being a transportation company having no initial carrier or line, but offering to make such special contract only, and not having power to execute any other, proposing to use initial and connecting roads for one continuous shipment.

Respecting the character of these companies and liability assumed, we hold they are the same. Both but in fact proposed to use agencies which they did not profess to own, and contracts made with one are governed by the same rules of law as those which control the other.

In the case of the *Merchants' Dispatch Transportation Company* v. *Bloch Brothers*, 2 Pickle, 392, a transportation company, not owning or controlling any means of conveyance itself, but engaging on its own behalf in the business of transporting goods through the agency and over the lines of other carriers of its own selection and employment, was held to be a common carrier, and subject to all the responsibilities attaching to that character; and that the carriers employed by such transportation company were its agents, and not the agents of the shipper or consignee. In this view, each could make any contract which the other could lawfully make, and would be bound by the same agreements and be exempted from the same responsibility in like contracts. This being true, the contract must be regarded as though made by one line for itself and as agent to make the special contract for others. The through bills of lading issued were for the performance of the service of transportation by several successive carriers, no one of which was under any common law obligation to enter into any contract at all for through carriage over all.

It is no longer doubted that each carrier in the connection could have made a contract for itself whereby it limited its liability for loss by fire. *York Manufacturing Company* v. *Illinois Central Railroad Company*, 3 Wall., 107; *Railroad Company* v. *Lockwood*, 17 Wall., 360; *Dillard Brothers* v. *Louisville and Nashville Railroad Company*, 2 Lea, 288.

These were all cases in which the contract was for delivery at a point beyond the terminus of the line of the contracting carrier. It was presumed in the first case cited, though there was no evidence to that effect, that the initial carrier had rates proportioned to the risk assumed from the nature of the goods carried, and that losses by fire must necessarily have affected the compensation demanded. But the Court said: "Be this as it may, the consideration expressed was sufficient to support the *entire* contract made."

Here it is proven that they had no charge for the entire route agreed upon with other carriers, and ready to be proposed to the shipper, without limitation of responsibility, but it is proven that they had such a rate over their own initial lines, and in the absence of proof it may be presumed that the connecting carriers each did have such a rate under the authority cited; but, be this as it may, as they were under no common law liability to agree to ship at all beyond their own lines, they may make such a special contract, and if otherwise reasonable (as in each of these cases it was) such contract is not void, but must be upheld.

Having determined in the order in which they most naturally arise the relation which the compress company occupied toward owners and carriers under its contracts and usage, with its liability for failure to procure insurance and its non-liability for negligence, we are brought to the questions which arise upon the insurance contracts effected by

it, and to others arising upon insurance contracts effected by owners, and to those of contribution between the several insurers.

The $301,750 of insurance procured by the compress company was distributed in forty-four companies. In all policies procured the Merchants' Cotton-press and Storage Company was named as the assured, and in each of them the risk was set forth on a printed slip pasted in the body of the policy, reading: "On all cotton in bales received by them [it] as agents [agent] for the benefit of railroads, transportation lines, or owners in the boundaries of the Merchants' Cotton-press and Storage Company's West Navy Yard Compress. * * * The liability of the insurers is to begin on the receipt of said cotton on the premises of the assured, as herein described, for compressing, and is to cease and terminate when removed from the platforms of the Merchants' Cotton-press and Storage Company for transportation."

The greater part of the cotton in the compress was covered by marine policies of insurance in favor of special owners. They aggregated about $700,000. The amount of cotton destroyed was about 14,000 bales, of the value of $700,000. Of this amount there was $52,472.26 worth for which no bills of lading had been issued and upon which there was no other insurance. The other cotton destroyed was covered by marine policies, and the amounts due the several parties thereunder have been paid or advanced to them by the several companies issuing

these policies. In respect to all these companies, except those represented and claiming through Deming & Co. in their suit, the Chancellor held there could be no recovery against the Merchants' Cotton-press and Storage Company because of a breach of its contract to fully cover by insurance; the theory upon which this holding was made being that announced in the Lancaster Mills case— that an owner not relying upon the obligation of the compress company to carry insurance, and having for himself *effected other insurance in good and solvent companies,* would not be heard to say that he had been damnified by the failure of the compress company to do for him that which he had done for himself. This proposition was not actually decided in that case, the necessity for it being obviated by the fact of *payment.* The owner, therefore, not only having insured in solvent companies, but having in fact received payment from them, could not complain that he had been injured by the failure of the compress company to cover his cotton with other insurance. Not having been injured by such failure, he acquired no right, and of course his insurer could obtain none on this account. But the proposition was law, and the Chancellor might properly have adjudged additionally, as we now do, that the transactions by which the marine insurance companies advanced money in full of the several losses—subject to be repaid only upon the contingency that the assured should recover from bailee or carrier primarily liable for negli-

gence, or, in the latter case, for loss without exemption in bill of lading—were, for all purposes of these suits, payments, and that thereafter neither the assured nor their insurers had any right, original, or by subrogation, against either compress company or carrier, unless the compress company was primarily liable for negligence or the carrier was primarily liable for the fire loss, unprotected by bill of lading exemptions.

· And this is true as to the arrangement effected by Deming & Co., which the Chancellor held was not a payment upon the particular facts now to be stated. After the loss, and when the insurance company was fully informed concerning the circumstances thereof, the president of the Phœnix Insurance Company procured, for and through Deming, of banks, the full amount of insurance of Deming & Co., and an amount additional sufficient to purchase claims of co-plaintiffs in that suit. This borrowing was done in the name of Deming, but it was absolutely secured by an actual deposit of the insurance company, and with the understanding that Deming was only to pay it out of the recovery against the carrier, or, to put it differently, that the insurance company was to pay it if Deming & Co. failed to recover in this case. Then, if no recovery could be had against the carrier, it was a payment. This is its legal effect. It concedes liability fixed by the loss, and that the policies extended to and covered it.

As to the questions that it now attempts to

make—that its policies did not cover this risk, and that it was not in fact liable—the company is concluded by the arrangement and understanding with Deming.

These companies all stand on the same footing; but, having paid the assured, they are entitled to be subrogated to his right against parties primarily liable—that is, against the compress company, if the loss was occasioned by its negligence; and against any carrier primarily liable for the loss— that is, one not protected by valid exemption from liability on account of loss by fire. We have elsewhere shown what carriers were primarily liable, and this is all we need say in this connection.

Another question was made and determined by the Chancellor against the liability of the Marine Insurance Company (limited), of London, for 305 bales of cotton, on account of "shore-risk" clause, whereby its risk of fire "on shore" prior to shipment was to cover a period not exceeding ten days. This money had been advanced to the assured by the insurance company, but the Chancellor held it not to be a payment because of the following agreement contained in its policy to this effect:

"It is understood and agreed between Warren Manufacturing Company and the Marine Insurance Company (limited), of London, that when said Warren Manufacturing Company shall present to Marine Insurance Company (limited) proofs that any cotton shipped, or purchased for shipment, by said Warren Manufacturing Company has been lost,

damaged, or destroyed while in the custody or control of any carrier, or while any carrier or other bailee was liable to said Warren Manufacturing Company therefor, said Marine Insurance Company (limited) shall advance to said Warren Manufacturing Company, or to the holder of the certificate issued by said Warren Manufacturing Company, against such shipment, an amount equivalent to the insured value of the cotton so lost, damaged, or destroyed, pending the collection of the claim against the carrier or other bailee, said Warren Manufacturing Company agreeing to refund said advance immediately upon collection of said claim.

"It is further understood and agreed that upon the first advice of such loss said Warren Manufacturing Company shall notify said Marine Insurance Company (limited), and shall select as their representative to deal with the carrier, or other bailee, such person or persons as the said Marine Insurance Company (limited) may designate.

"Warranted that this agreement to advance, and the policy of insurance to which it applies, shall not in any way inure to the benefit of any carrier or other bailee.

"This agreement to be binding so long as policy No. 502, issued by said Marine Insurance Company (limited) to said Warren Manufacturing Company, shall remain in force."

It was held that the 305 bales were not covered by the policy, and that advancement of the amount

of its insurance did not, in legal effect, amount to payment, or estop the company to deny its liability or insist that the policy did not cover the loss, and that by reason of said agreement the company had the right to advance it and still contest the liability.

The reasoning of the learned Chancellor on this point can be best presented by quoting it. It is as follows:

"The owners of cotton holding the policies of the Marine Insurance Company (limited), of London, were not insured by those policies to the extent of all cottons that remained in the compress exceeding ten days before the fire, and to this extent the complainants will take decree against the compress company for breach of its liability to insure and for shares of insurance actually taken by it. Under the terms of the agreements attached to the policies of this company, and forming parts thereof, the advances of money to the assured cannot be regarded either as payments of the losses or as evidences of admissions of liability on the policies. These agreements expressly provide that when proofs of loss merely are presented, the insurance company shall advance 'an amount' equivalent to the insured value of the cotton so lost or destroyed, pending the collection of the claim against the carrier or other bailee, the insured agreeing to refund said advance immediately upon collection of said claim.' Here was an advance actually made under a valid stipulation

of the policy, and not a payment in the guise of an advance, made under a new arrangement after the loss, independent of an obligation of the company to make it. Why was the advance made? Clearly because the contract imposed the obligation to make it. Why was it received at that time by the assured? Clearly because at that time he was not, under the contract, entitled to any thing more. Without elaboration I think it is entirely clear that this feature of these policies distinguishes them, in respect of the point under consideration, from all the others where the loans or advances were made without stipulation in the policies to that effect, and without obligation on the part of the company under post-note arrangements, which bear unmistakable signs of cloaking the real purposes of the parties."

The agreement on which the money, after loss, was advanced, was as follows:

"WHEREAS, By certain contract or contracts of insurance made and concluded on or about the fifth day of November, the Marine Insurance Company (limited), of London, insured Messrs. Warren Manufacturing Company and their assigns against loss or damage to certain cotton therein described, and the said assured warranted that the said insurance should not, in any way, inure to the benefit of any bailee of said cotton; and the said assurer undertook that in case of loss of or damage to any of said cotton while in the custody or control of any bailee, that it would lend to as-

sured, or to their assigns, an amount equivalent to the insured value of the cotton so lost or damaged, pending the collection of the claim for the loss or damage from the bailee or bailees liable therefor; and,

"WHEREAS, Certain cotton claimed by the said assured to be so insured, has been damaged or destroyed while in the custody or control of the bailees thereof, to wit: a loss by fire amounting in its insured value to the sum of twenty-five thousand one hundred and three and thirty-seven one hundredths dollars;

"Now, therefore, this agreement witnesseth, that the undersigned, the above-named assured, have this day borrowed from the above-named, the Marine Insurance Company (limited), of London, the sum of money last above written, *upon the express condition that the said sum shall be by them returned to the said, the Marine Insurance Company (limited), upon the collection of the claim for the loss or damage to the cotton from the bailee or bailees liable therefor, and payment thereof to the undersigned.*

"Dated December 29, 1887.

"(Signed) WARREN MANUFACTURING Co.,

"JOHN WATERMAN, *Treasurer.*"

It will be seen that the Chancellor reached this conclusion, and took this case out of the rule herein announced respecting payment, by the assumption that this advance was agreed to be made *at all events* in the policy, and that the subsequent advance having been made in pursuance of

22—6 P

the original contract, it was not payment or concession of liability because the policy covered the loss sustained.

In this conclusion we do not concur. The original agreement, properly construed, only required an advance in case the loss was at a time and under such circumstances as made the company liable therefor; and when the amount to cover a loss was advanced only to be returned upon collection from the bailee or bailees liable therefor, it was a concession that the loss was covered by the policy, and but reserved the right of the insurance company to recover of the bailee through the owner. If the bailee was not liable to the owner, there was to be no return, and there could be no subrogation.

There was nothing in the policy, properly construed, which required this advance whether the policy covered the loss or not. There was nothing to prevent the insurance company requiring, as a condition of advancement, that the assured should *guarantee* a return if, for any reason, the insurance company turned out not to be liable, or at least *agree* to return the money in that event. It chose to advance without taking any guarantee or agreement for restitution if it should thereafter appear that the insurance company was not liable for the loss, but took instead an obligation to return it, not if it were not liable, but if some one else than the bailee should be made so.

This must be held, in legal effect, to concede

that the loss was covered by the policy, and that the insurance company was liable therefor, and to reserve only the right of subrogation to assured's claim against the bailee for negligence and carrier unprotected by fire clause, and hence primarily liable—a right existing without such contract. This advance was, therefore, a payment. If the insurance company could not have been held to make it, it has chosen *voluntarily* to do so, and thus put the owner in a situation in which he cannot be damaged by reason of failure of the compress company to insure for him; not being able to establish this, he has no right to a decree against the compress company, and, of course, his insurer has none.

The only thing not conceded by the payment was the right which payment gave of subrogation to owner's right against one primarily liable for negligence or loss by fire without exemption.

There is still another special question, which arises in the marine insurance policies, proper to be disposed of here, before coming to the last insurance question we will present—that of contribution. The question indicated is the construction of what is known as the "American clause," contained in some of the marine policies.

It would be a useless increase of the volume of this statement to quote that clause from all of the said policies. They are all in substantially one form. We quote two of them, to wit:

(1) That of the Phœnix Insurance Company, held

by R. H. Deming & Co.: "Provided always, and it is herein further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid, *prior in date to this policy*, then the said Phœnix Insurance Company shall be answerable only for so much as the amount of such prior assurance may be deficient toward fully covering the premises hereby assured; and the said Phœnix Insurance Company shall return the premium upon so much of the sum by them assured, as they shall be by such prior assurance exonerated from.   And in case of any insurance upon the premises, *subsequent in date to this policy*, the said Phœnix Insurance Company shall, nevertheless, be answerable for the full extent of the sum by them subscribed hereto, *without right to claim contribution from such subsequent assurers*, and shall accordingly be entitled to retain the premium by them received, in the same manner as if no subsequent assurance had been made."

(2) That of the British and Foreign Marine Insurance (limited), of Liverpool, is as follows: "Provided always, and it is hereby further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid, *prior in day of date to this policy*, then the said *assurers* shall be answerable only for so much as the amount of such prior assurance may be deficient toward fully covering the premises hereby assured; and the said *assurers* shall return the premium upon so much of the sum by them assured as they shall be, by such

prior assurance, exonerated from. And in case of any insurance upon the said premises *subsequent in day of date to this policy*, the said *assurers* shall, nevertheless, be answerable for the full extent of the sum by them subscribed hereto, *without right to claim contribution from such subsequent assurers*, and shall accordingly be entitled to retain the premium by them received, in the same manner as if no such subsequent assurance had been made. Other insurance upon the premises aforesaid, *of date the same day as this policy*, shall be deemed simultaneous herewith; and the said *assurers* shall not be liable for more than a ratable contribution, in the proportion of the sum by them insured, to the aggregate of such simultaneous insurance."

Under the terms of this, the American clause, as contained in the various marine policies, it was held by the Chancellor that the question as to whether the fire insurance preceded, was contemporaneous with, or was subsequent to the marine insurance was to be determined not by the dates of *the respective policies*, but by the date of *the attaching of the risk* under each; and, holding that the risk attached contemporaneously under each, it was held that the principle of contribution must govern.

To fully understand the Chancellor's view and reasons therefor, it is proper to quote his admirable statement in full on this point. It is as follows:

"I am of the opinion that, under the American clauses of the marine open policies, there was no

insurance until the cotton was brought within their terms and became the subject of insurance. An open policy does not, *ex vi termini*, insure property until the property is brought within its terms. Hence, there is no insurance until then. The rule making the date of the policy the date of the insurance applies to valued policies, but not . to open policies. Here, confessedly, under this rule, the risks under the marine open policies and the fire open policies were concurrent, and the American clauses do not operate."

The proposition of fact upon which this is based is denied, and . it is insisted that there was a period of time, however brief, after purchase before deposit in the compress, when the cotton was covered alone by the marine policy; and such seems to be the fact. But, waiving this, we hold that the date of the policy, and not of the attaching of the risk, must govern. It is so agreed in express terms, and no reason is perceived why such an agreement might not be made in contemplation of open policies. It is true that ordinarily the date of a contract is not material; but this is not true where it is specially made so in terms—where it is, among other things, an object contracted about.

The insurer, for whose advantage, in one sense, it is, may well contract to assume an entire liability, and retain an entire premium against contemplated additional insurance as well as existing insurance.

No case has been found adjudging the contrary, and although none has been produced in which the question was in terms raised and disposed of, several have been cited where, upon the facts, it arose, and was taken for granted as we decide it, neither counsel nor Court disputing its correctness, and where it was necessarily applied in effecting the result. *American Insurance Company* v. *Griswold*, 14 Wendell, 399; *Whiting* v. *Insurance Company*, 15 Maryland, 197.

That the actual date controls is assumed and taken for granted in numerous cases. *Lee* v. *Insurance Company*, 6 Mass., 208; *McKim* v. *Insurance Company*, 2 Wash. C. C. Rep., 95; *Insurance Company* v. *Catlett*, 12 Wheaton, 383; *Seamens* v. *Lovring*, 1 Mason, 146.

While in others it has been held, if policies bear same date, evidence might be *received* to show actual time of execution of each. Opinion by Judge Story, *Potter* v. *Insurance Company*, 2 Mason, 476.

This last contingency was provided for in one of the policies quoted, which made other insurance of the *same day* as that policy "simultaneous" therewith; a strong evidential fact to show that the date of the contract was regarded as controlling, and that it is now construed as then understood.

It will be seen further on that the purpose of the clause was to alter the common law rule of contribution as announced in a case to be cited, and to make the policies liable successively in the

order of their respective *dates*. If it be now decided that the date does not control, but the date of attaching of the risk under open policies determines, the rule of contribution, which the clause was intended to avoid, would in all its force be re-instated.

We think it clear that it can have no such construction as would defeat the purpose for which it was originated.

In view of the origin and purpose of this clause, this construction is all the more manifestly correct. Its object, as deduced from its effect, seems to have been to meet a modification or change made in the law of insurance as it had been understood to exist in England, before such decision, by a decision of Lord Mansfield in *Newby* v. *Reed*, 1 W. Black Rep., 416.

It is thus stated by Chancellor Walworth in the case hereinbefore cited of *Insurance Company* v. *Griswold:*

"By the continental law of Europe, and the law of English insurance as it existed previous to the decision of Lord Mansfield in *Newby* v. *Reed*, 1 W. Black R., 416, if there were several policies of different dates upon the same subject, and the amount of insurable interest was insufficient to cover the whole amount insured in both policies, so as to constitute a case of double insurance, the second policy only attached upon or covered so much of the insurable interest as was not covered by the first policy; and the second underwriter

was only entitled to retain the premium *pro tanto*, where the commencement and termination of the risk and the perils insured against were the same. 3 Kent's Com., 281; Vanderlinden's Com., 655, Book IV., Ch. 16, Sec. 7; Miller on Insurance, 366. By this ancient English rule and the continental law, the second underwriter was, as he ought to be, merely substituted in place of the assured, as to the uninsured interest of the latter which was not covered by the first policy; so that the rule of apportionment between the first and second sets of insurers, where both policies, when taken together, were sufficient to cover the whole insurable interest, was precisely the same as it would have been between the underwriters in the first policy and the assured if the second insurance had not been made. If the object of the American clause was to restore this ancient rule of apportionment between the underwriters in successive policies as it originally existed in the mercantile law of England as well as the rest of Europe, it is hardly possible to do it in more appropriate and explicit language than is used in the last paragraph of this clause. That language is, that in case of an insurance subsequent in date to the first policy, the underwriters in the first policy "shall nevertheless be answerable for the full extent of the sum by them subscribed, without the right to claim contribution from such subsequent assurers, and shall accordingly be entitled to retain the premium by them received, in the same

manner as if no such subsequent assurance had been made;' that is, that they are to have no right to claim a contribution from the subsequent assurers, and are to be answerable to the assured in the same manner as if the subsequent insurance had not been made, as well as to retain the premium in the same manner. It appears to be impossible, therefore, under this policy, that the circumstance of there being subsequent policies underwritten by others, could make any difference as to the apportionment of the loss as between the underwriter in the first policy and the assured, or those who represented the insurable interest of the goods on board at the time of the loss, not covered by that policy."

We have preceded the quotation with the argument and statement of the purpose for which it is made, and do not deem it necessary to add more on that question.

We come now to the question of contribution between the insurers or co-insurers, the fire and marine companies. The nominal assured in the fire policies was the compress company; the designated beneficiaries were the railroad companies, transportation lines, and owners. The two former (the compress company and carrier risks) were not included in the marine policies. Nevertheless, it is insisted that the owner's risk covered in the marine policies was the same as owner's risk covered in the fire policies, and that contribution must therefore be enforced between these companies.

The insuperable objection to this, so far as the compress company and carriers are involved, is that as to their risks they are not covered by the marine policies, while they are covered by the fire policies. It follows, therefore, that, so far as the compress company or the carriers may be held liable, the fire companies must respond to that liability, and there can be no contribution as to owner's insurance until that liability is extinguished. If this were not true, the very purpose for which the fire policies were procured—that of indemnity to the assured—would fail. The object of all such insurance is indemnity, and no equity of contribution can defeat it. Indemnity is the *prime* object of insurance. Every other rule is subordinate, and in no case will contribution be enforced so as to deny indemnity and equity to all the assured.

In application of this rule the compress company insists that the fire insurance must be so appropriated as to leave no party included among the assured in these policies unprotected.

Recognizing that the effort to protect its own interest had been made without specification, except that it was assured, and that carrier's and owner's interest specially insured must be taken into consideration, and be provided with full indemnity before it is affected, and to prevent its being injuriously affected, it insists that it has the right to have the fire insurance fund so applied as to indemnify carriers and uninsured owners, and thus

protect itself as one of the assured, which it insists
it is in this sense and to this effect, because the
object of being an assured was to derive any
benefit properly or in any contingency occurring
in consequence of insuring these special interests;
that, having thus insured them, it, as assured, is
a beneficiary to any extent which such insurance
so applied makes it, where their protection and
its own is secured by such application.

It does not insist that it can in any event take
a benefit under these policies over an owner, but
it claims the right to have the fire insurance ap-
propriated to uninsured owners because the others
are not damnified; and if they are, then the com-
press company is liable to them under its contract,
express or implied, to procure insurance, and the
money it receives in such appropriation would have
been at last appropriated to owners when needed
for their indemnity.

' It is insisted, however, that in this contingency
which has now arisen, where certain owners are
damnified by the loss and others not, that equity
requires the appropriation in the carrier's favor to
the loss of the otherwise uninsured owner; that
such appropriation cannot injure an assured owner,
for he gets his full insurance from that source,
and, if it fails, the compress company is liable, and
the protection it receives in the appropriation
claimed goes to his benefit; that this result can-
not be defeated in favor of contribution by the
intervention of owner's insurer claiming subroga-

tion. He is not entitled to subrogation to the owner's claim against the compress company for failure to procure insurance. This right would only exist as to that procured, nothing else preventing; but here it must not be construed to extend to that, and thus defeat the application of the policies procured to indemnity of the assured.

The claim of the compress company is not that it escapes liability to the owner for default in not procuring insurance, or that it is entitled to thus escape it; but it is that to the extent the compress company did take out such insurance, the insurance can and must be applied before any contribution is invoked, so as to protect the compress company to that extent, and that is done by applying this insurance to the carrier liability and to cover loss of the otherwise uninsured owner.

In this view we concur, disagreeing with the Chancellor, who held all owners entitled primarily to participate, and their insurers to do so by subrogation.

This was one of the questions not before the Court in the Lancaster Mills case. There it was said that, while taken out for the benefit of carriers (meaning contracting carriers), the cotton itself was insured, and this we again repeat here. But the question of contribution and subrogation now arising did not arise in that case, and what was there said was not in that view. Leaving therefore that question, we return to the question of contribution among others.

The rule of contribution among co-insurers is one which equity has evolved out of conditions of contemporaneous liability for the same loss. Like all others of such origin, it is the application of common sense and natural justice to situations and the solution of difficulties not provided for by fixed rules of law. Its object is to do justice, and it will not be, under any circumstances, a correct application of it if the result is injustice to any of the assured affected by the application. If the property which was the subject-matter of insurance was the same, interests the same, and risks identical, the contribution consequent is obviously that which would be proper as between co-sureties for the same obligation. But here the fire policies were on two interests and risks (that of contracting carriers and of the compress company as shown) not covered by the marine policies, and the fire insurance fund must, therefore, be first applied so as to protect these. If in such application it is exhausted in indemnifying the carriers held liable and uninsured owners, then there will remain no fund for contribution. If not, the marine insurers not having the American clause, are entitled to have contribution, as the fire insurance was for all owners including those covered by the marine policies (excluding, of course, Hall, who did not consent to procuring of fire insurance for him but forbade it).

To do equity the fire insurance must be appropriated to cover carrier liability and otherwise uninsured owners. As it is insufficient for this pur-

pose, it will result that there will be no contribution.

One of the claims involved in this record—that of Paton & Co. for twenty-nine bales of cotton—stands on different ground from that of others discussed. The bill of lading of the Kanawah Dispatch held for this cotton had a valid fire clause exemption; but this, of course, did not operate to excuse the company from liability if the loss was occasioned by negligence; and it is insisted the loss was so occasioned. There was no special allegation that the twenty-nine bales referred to were burned after they were loaded on the cars; but such was the fact, as proven upon general allegation of liability of the company for its loss. The evidence was proper under the general allegation, and if it makes out a case of negligence, the Kanawah Dispatch is liable, notwithstanding the fire clause exemption.

The testimony of witness Wheaton, introduced by defendant, shows that this cotton was in the second section of a train made up to leave about seven o'clock; that this section stood near the compress. The train should have been made up and pulled away from there from one-half to three-fourths of an hour before leaving time. He says leaving time was seven o'clock or half-past seven—"about seven." He was asked by counsel of the company to examine his (witness') office records and see if he can find the schedule then in force, and give it to said counsel, and answered: "I will do so."

Whether he did or not does not appear. If so, counsel did not file it. It may therefore be fairly presumed that the starting time was not later than seven. He was asked by complainant's counsel, "If the leaving time was seven o'clock, and that custom had been followed, would not the compress track have then been cleared?" and answered: "It would have been cleared of the loaded cars."

It thus and elsewhere appears in his testimony that the cars were left where they burned later than ordinary. But, added to this, the witness shows that, while taking off the first section of the train, the "engineer, in starting, broke a draw-bar about the middle of the car of the first sec-'tion, the key came out, and they had to throw that car on the main line and go back and get the rear part of the train and pull · that out;" that this breakage caused a delay of at least seven to ten minutes.

In the meanwhile, before reaching the second section, it had taken fire, and in that condition · was removed. Even after this, two cars attached to this one containing the twenty-nine bales of cotton were put out with buckets of water. This one could not be, and it was lost.

Upon the facts, the Chancellor found this issue in favor of defendant.

It is insisted here, in support of the finding, that neither the delay nor the breakage of train, but the fire, was the proximate cause of the loss. In this we do not concur. Granting that the

slight delay would not, of itself, have made the company liable, here we have, in addition, the breaking of train machinery when the effort is made to remove the cotton, but for which it might have been saved, notwithstanding the fire. This, we think, was, therefore, the proximate cause of the loss. The proximate cause of an injury may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, which, had it not happened, the injury would not have been inflicted, notwithstanding the latter.

Illustrating by these facts: It is true that the fire destroyed the cotton, and in that sense caused the loss, but it appears that, notwithstanding the occurrence of the fire, the cotton would not have been burned by it had not the breaking of the train while it was being removed happened, so that, but for this fact, the cotton would have been saved.

This must therefore be held to be the proximate cause of the loss, and, if it was the result of negligence, the carrier must answer for it. The complainant must show negligence. He proved a delay of the train, caused by breaking of machinery. It then devolved upon the carrier to show that this resulted from a latent defect or other cause sufficient to excuse it. Failing to do this, the carrier was liable, and the liability is here adjudged, reversing the decree of the Chancellor on this point.

23—6 p

There was a question decided by the Chancellor as to appropriation of the share of insurance of carrier not before the Court, which it is necessary to notice, and we will do so in the summary of results of modifications of his decree, this being a most material one, for we disagree with the Chancellor that this fund can be here disposed of under the principles settled.

To indicate the modifications resulting, we add a more specific statement of loss and relations to it of various carriers. The figures given are from the briefs of counsel, assumed to be accurate without actual verification from the record. There were 14,009 bales of cotton in all in the compress when burned. Of this number 2,124 bales were never sued for, the compress company or its insurers having paid for 1,038 bales to owners; and no suit was brought as to the remaining 1,086 of the 2,124. Of the remaining 11,885 bales, 2,226 were in the compress shed under permits and compress receipts, but covered by no bills of lading. The other 9,659 were in the compress shed, and under bills of lading of various railroad companies and transportation lines; but some have disappeared, leaving about 9,579 bales bills of lading cotton involved in these and suits heretofore heard, with twenty-nine bales belonging to Paton & Co., covered by bills of lading of Kanawha Dispatch, and burnt on cars of Newport News and Mississippi Valley Company, making in all 9,608 bales now in suit. The following

carriers had executed bills of lading for same, to wit:

|  | BALES. |
|---|---|
| Cairo, Vincennes and Chicago Line | 5,087 |
| Kanawha Dispatch (or N. N. and M. V. Co.) | 2,358 |
| Newport News and Mississippi Valley Company | 477 |
| Louisville, New Orleans and Texas Railroad | 464 |
| Indiana, Bloomington and Western Railroad | 455 |
| Cleveland, Columbus, Cincinnati and Indianapolis R. R. | 410 |
| Blue Line | 357 |
| Total | 9,608 |

The Kanawha Dispatch is held not liable in all suits except that of Paton & Co. In the contribution, therefore, 2,329 bales are eliminated so far as the carrier liability is concerned. There is consequently no recovery to be had against the compress company through this carrier by owners in favor of marine insurers. The recovery of marine insurers through owners depends upon establishment of the primary liability of the carriers having contracts with the compress company to cover cotton with insurance, and thus by and in consequence of such recovery, reaching the compress company. It is indispensable therefore, to that result, that the carrier be sued and judgment be rendered against it.

The Cairo, Vincennes and Chicago line is not sued, and, therefore, there can be no recovery in favor of owners through that carrier against the compress company. This eliminates 5,087 bales for which no recovery can be had against the compress company.

The Chancellor thought, by reason of declaring a liability without adjudging it against this com-

pany not before the Court, he could pass over it and appropriate so much of the fire insurance fund as he might thus determine belonged to it.

We are of opinion this cannot be done. There was no service on the Cairo, Vincennes and Chicago Company; no appearance entered by or for it; no attachment of property and publication, and hence it is not actually or constructively before the Court for the appropriation of any property or fund in which it has an interest. No appropriation of any fund can be made to an extent, which, under any holding in a suit against it, might result in showing that it is injured. It cannot be injured by the appropriation of that proportion of the fire insurance fund which, as between itself and other carriers, would belong to it under any ruling. Hence, in appropriating so much of that entire fund to the liability of other carriers as their proportion of the liability is to its share, no injustice can be done, and this is the extent to which we can go in this case.

The compress company is entitled to hold that fund in trust for the absent carrier to indemnify it (and to that extent to protect the compress company) in case the carrier is sued and its liability fixed, and it sues the compress company.

In view of the fact that only contracting carriers (that is, those having contracts with the compress company to carry insurance) are enumerated as being entitled to participate in the insurance fund, it is deemed superfluous to say that non-

contracting carriers, as the Blue Line, are not so entitled, and will be, by decree, excluded from such participation.

We are aware that, long as this opinion is, it is necessarily too brief in many particulars. The number of cases and the multitude of questions involved have made the whole presentation a matter of extended writing, even after elimination of many special questions as the result of the decision of certain general ones, but for the same reason have occasioned us to deal in too brief a manner with most, if not all, of them to do justice to the able and elaborate arguments which have been addressed to us. But, after all, it must be remembered that what is desired of a Court is a solution of difficulties, a correct decision of questions rather than elaborate statement or discussion of them, particularly when, from their number or variety, an opinion of much length must necessarily be short in particulars.

It would have given us much pleasure to have, with each question, restated at length the various positions and arguments of counsel *pro* and *con*, and to have reviewed the many authorities collected with so much industry and pressed upon us with so much force; but time was inadequate to the task, and we have been obliged to content ourselves with determining, upon due consideration, the application of the law as, in our judgment, it is best settled amid the views presented.

If, in reflecting the judgment of the Court, I

have done it with reasonable accuracy and correctness, I have accomplished the purpose chiefly desired, and better than would have been done by elaboration of statement and inaccuracy of conclusion.

The decree of the Chancellor will be modified as herein indicated. The costs of both Courts will be divided, in the several suits in which they are respectively involved, between the marine insurance companies and the compress company. Costs of special recovery, as that of Paton & Co. against defendant held specially liable, and complainants cast in suits will pay cost thereof.